IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| DEMETRIUS BRAXTON, | ) |
| Plaintiff | ) |
| v. | ) 1:12-cv-01186 (LMB/TCB) |
| COOK MEDICAL INC., | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Before the Court is defendant Cook Medical Inc.'s Motion for Summary Judgment ("Motion"). For the following reasons, defendant's motion will be granted.

### I. PROCEDURAL BACKGROUND

Plaintiff Demetrius Braxton ("Braxton" or "Plaintiff"), proceeding pro se, filed this civil action on October 23, 2012. Dkt. No. 1 ("Compl."). Braxton's complaint alleges race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, et seq. and age discrimination under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621, et seq. Compl. ¶¶ 1, 3, 4. Braxton seeks an award of damages, costs, and attorney's fees. Compl. ¶ 5.

After defendant Cook Medical Inc. ("Cook") answered Braxton's complaint, a Scheduling Order was issued setting May 10, 2013 as the date by which all discovery had to be concluded.

Dkt. Nos. 5, 8. On February 6, 2013, the parties filed a Joint Discovery Plan which the court approved. Dkt. Nos. 15, 16.

Cook filed a motion on May 3, 2013 to extend the time to complete discovery to take the deposition of a corporate representative of Braxton's former employer, Zimmer Mid-Atlantic, Inc. ("Zimmer"). Dkt. No. 20. In support of its motion, Cook stated that despite diligent efforts to take the deposition before the close of discovery, "it may be necessary to reschedule that deposition to a date after the [discovery] cut-off to meet the reasonable needs of Zimmer, the witness, and Zimmer's counsel, and to avoid burdening them unnecessarily." Dkt. No. 21 at 3. The court granted Cook's discovery motion on May 10, 2013. Dkt. No. 24.

The same day, Braxton, who had taken almost no discovery, filed a motion to extend discovery for three months - until August 10, 2013 - to allow him to review written discovery produced by Cook; respond to Cook's objections to his discovery requests; and "depose the appropriate party and non-party individuals and witnesses, once the Plaintiff has a better picture of his case, after all requested documents and information have been received." Dkt. No. 25 at 1-2. Braxton's motion was denied on May 16, 2013. Dkt. No. 30.

In accordance with the Scheduling Order, Cook filed its witness and exhibit lists on May 15, 2013, the day before the final pretrial conference. Dkt. Nos. 27, 28. Braxton failed to timely file his witness and exhibit lists; however, the Court allowed him until May 20, 2013 to do so. Dkt. No. 29. Braxton filed his exhibit and witness lists on the day they were due. Dkt. Nos. 31, 32.

On May 30, 2013, Cook filed the motion presently before the Court with the notice required under Local Civil Rule 7(K) and Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975). That notice provided:

> (1) Plaintiff is entitled to file a response opposing this motion, and any such response must be filed within twenty-one (21) days of the date on which this motion has been filed;
>
> (2) If Plaintiff does not file a response, the Court could dismiss the action on the basis of the motion for summary judgment and supporting papers filed by Defendant, Cook Medical Inc.;
>
> (3) In his response, Plaintiff must identify all facts stated by Defendant, Cook Medical Inc., with which Plaintiff disagrees and must set forth Plaintiff's version of the facts by offering affidavits (written statements signed before a notary public and under oath) or by filing sworn statements (bearing a certificate that it is signed under penalty of perjury); and

> (4) Plaintiff is also entitled to file a legal brief in opposition to the one filed by Defendant, Cook Medical Inc.

Cook's motion was accompanied by a memorandum in support [Dkt. No. 36] and the declarations of Joseph Burger, Regional Manager for Cook's Aortic Intervention Single Business Unit ("Burger Decl.") [Dkt. No. 37], and Tom Shurig, Cook's Director of Human Resources ("Shurig Decl.") [Dkt. No. 38].

Braxton failed to timely file an opposition to Cook's motion, and on June 27, 2013, he was ordered to advise the Court within five business days whether he would oppose the motion and to show cause why an untimely opposition should be allowed. Dkt. No. 43. Seven business days later, on July 8, 2013, Braxton filed a motion to extend the time to respond to July 19, 2013, the date of the hearing on Cook's motion. Dkt. No. 44. In support of his motion, Braxton argued that he needed "more time to acquire relevant and proper affidavits"; that "Defendant did not provide what the Plaintiff believed to be critical, pertinent and relevant documents that would have ultimately support Plaintiffs [sic] claim of disputed facts"; that denial of his motion would "result[] in a gross lack of discoverable evidence being provided to Plaintiff to sufficiently support his case theory"; and that he "did not have the resources to perform necessary depositions" during discovery. Id.

By Order dated July 9, 2013, the Court allowed him to file his opposition by July 11, 2013. Dkt. No. 47. Braxton filed his opposition on July 15, 2013 and Cook timely filed its reply on July 18, 2013. Dkt. Nos. 48, 51; see Dkt. No. 49 (ordering Cook to file a reply to Braxton's opposition by July 22, 2013).[1]

## II. FACTUAL BACKGROUND

Plaintiff is a forty-five or -six year-old[2] African American male who began his employment with defendant as a district manager in Cook's Aortic Intervention Strategic Business Unit ("SBU") in April 2009. Shurig Decl. ¶ 6, Attach. 2. As a district manager in the Aortic Intervention SBU, Braxton was generally responsible for selling and marketing Cook's medical devices and products, including equipment for endovascular treatment of abdominal and thoracic aneurysm disease. Shurig Decl. ¶¶ 5-7, Attach 2. His sales territory included Washington, D.C. and surrounding areas in Virginia and Maryland. Shurig Decl. ¶ 10, Attach. 2. Specifically, Braxton's job duties included collaborating with surgeons and physicians in cases where Cook's products and services were used, participating in the deployment of those products and services

---

[1] By Order dated July 17, 2013, the Court denied Braxton's request to file further briefs. Dkt. No. 50.

[2] Braxton's complaint states only that he was born in 1967. Compl. ¶ 1.

during procedures in the operating room,[3] developing new and expanding existing business via an annual business plan for his assigned territory, meeting and exceeding sales goals, and educating customers about Cook's products and services. Shurig Decl. ¶ 9, Attach. 3.

Braxton began his sales work for Cook in August 2009. Shurig Decl. ¶ 10. In 2010, his sales were $1,442,979, which were $718,784 less than sales in 2009, when the territory was primarily (until August) under the supervision of the previous district manager. Shurig Decl. ¶ 14, Attach. 4. The difference between the sales in 2009 and Braxton's sales in 2010 represented a 33.2 percent decline, the largest sales decline in Braxton's region and more than three times the loss of the next closest district manager. Id. Braxton's sales performance continued to be comparatively poor in the first and second quarters of 2011, when he was again ranked last among district managers in his region in total sales and monthly averages. Shurig Decl. ¶¶ 15-17, Attach. 4.

---

[3] Contrary to Cook's declaration that Braxton's job functions included "actively participating in deployment of Cook products and devices during surgical procedures in the operating room" [Shurig Decl. ¶ 9, Attach. 3], Braxton argues that he "did not actively participate hands-on in the deployment of Cook products and devices during surgical procedures in the operating room"; rather, "Cook's products and devices were deployed by trained and licensed physicians and clinical staff during surgical procedures in the operating room." Dkt. No. 48 at 3 (emphasis in original).

In the course of a surgical procedure in March 2011, Braxton provided a physician with an expired endovascular graft that was then implanted in a patient. Shurig Decl. ¶¶ 20-22, Attachs. 5-7; Dkt. No. 48, Ex. 34. Cook investigated the incident and issued Braxton a formal written warning which Braxton refused to sign. Shurig Decl. ¶¶ 21-24, Attach. 8; Dkt. No. 48, Ex. 34.

Following the March 2011 incident and given "complaints received from physicians, operating room staff, purchasing staff and co-workers," as well as Braxton's poor sales performance over the course of 2010 and the first quarter of 2011, in April, Cook placed Braxton on a Performance Improvement Plan ("PIP"). Shurig Decl. ¶¶ 26-32, Attach. 10. Under the PIP, Braxton was expected to increase sales, serve patients, be accountable, accept constructive criticism, earn the trust of physicians, and be a good teammate. Id.

To help Braxton fulfill these expectations, the PIP set certain sales goals for April ($150,000), May ($160,000), and June ($170,000) and required Braxton to provide sales planning sheets, reports, forecasts, and a written business plan to his regional manager, who would also be available to answer questions and provide coaching and feedback. Id. The PIP provided that if Braxton achieved his goals, the PIP would not

7

appear in his personnel file. Id. If he did not achieve the goals, he would be subject to further "disciplinary action, up to and including termination." Id. Braxton signed the PIP under protest. Id.; Dkt. No. 48, Ex. 44. Two weeks later, on April 29, 2012, Braxton filed a complaint of race discrimination with the Equal Employment Opportunity Commission ("EEOC"). Shurig Decl. ¶ 39, Attach. 12. Braxton's complaint stated in particular:

> I began employment with Cook Medical in March, 2009 as a District Manager. The Black employees are treated differently than the White employees. For example, on April 18, 2011, I was unfairly placed on a Performance Improvement Plan (PIP). Non-Black employees, whose performance is similar to mine, are not placed on PIPs.

Upon receipt of the complaint, Cook's Director of Human Resources conducted an investigation which included an interview with Braxton to notify him of the investigation and assure him that he would not be subject to retaliation. Shurig Decl. ¶ 40. During that interview, Braxton admitted the complaint was baseless. Id.

Braxton's sales in April, May, and June 2011 did not meet the sales goals set out in the PIP. Shurig Decl. ¶ 34, Attach. 4. In addition, he failed to provide timely business plans and reports to his regional manager as required. Shurig Decl. ¶ 35, Attach. 11. As a result of Braxton's failures to meet the PIP's

goals, Cook terminated his employment and arranged a meeting on July 5, 2011 to finalize the termination and accept the return of company property. Shurig Decl. ¶ 37, 38. Braxton failed to attend the meeting, but did return Cook's property. Id.

On October 6, 2011, Braxton filed a second EEOC complaint, this one alleging retaliation. Shurig Decl. ¶ 41, Attach. 13. The EEOC issued a Dismissal and Notice of Rights on July 26, 2012, providing that Braxton had ninety days within which to file a civil action in federal or state court. Id. Braxton timely filed this lawsuit.

### III. DISCUSSION

#### A. Standard of Review

Summary judgment is appropriate when the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of "pointing out to the district court [] that there is an absence of evidence supporting the nonmoving party's case," after which the nonmoving party must "go beyond the pleadings" and present specific facts to establish a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324-25 (1986). In going beyond the pleadings, "the non-moving party may not rely upon mere allegations" and "his response must, with affidavits or other verified evidence, set forth specific facts showing that there

is a genuine issue for trial." Graham v. Geneva Enters., 55 F. App'x 135, 136 (4th Cir. 2003) (per curiam).

Although the court must view the record "in the light most favorable to the non-moving party," Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 324 (4th Cir. 2012), the "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); see also Am. Arms Int'l v. Herbert, 563 F.3d 78, 82 (4th Cir. 2009). Rather, when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (internal quotation marks omitted). Further, in employment discrimination actions, it is not the role of the court to "sit as a super-personnel department weighing the prudence of employment decisions." Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 272 (4th Cir. 2005) (internal quotation marks omitted).

### B. Braxton's Race Discrimination Claim

For Braxton's race discrimination claim to survive Cook's motion, he must either rely on direct evidence that race discrimination motivated Cook's decision to terminate his employment or prove his case indirectly. Because there is no direct evidence of racial discrimination, Braxton must proceed

10

by the indirect method. That method first requires that a plaintiff establish a prima facie case by providing evidence that (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action; and (4) similarly situated employees outside his class were retained or treated more favorably under similar circumstances. Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284-85 (4th Cir. 2004) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 807 (1973); Brinkley v. Harbour Recreation Club, 180 F.3d 598 (4th Cir. 1999)); Ze-Ze v. Kaiser Permanente Mid-Atl. States Regions, Inc., 833 F. Supp. 2d 543, 548 (E.D. Va. 2011).

If Braxton can make a prima facie showing of discrimination, the burden shifts to Cook to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Hill, 354 F.3d at 285. If Cook articulates such a reason, Braxton must then prove by a preponderance of the evidence that Cook's stated reason is, in fact, merely a pretense for discrimination. Id. (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000)).

As Cook concedes, there is no dispute that Braxton satisfies the first two elements of the McDonnell Douglas test:

11

he is a member of a protected class (African American) and he has suffered an adverse employment action (being placed on the PIP and ultimately terminated from employment). He fails, however, to satisfy the third element of satisfactory job performance because Cook has submitted extensive evidence to support its claim that Braxton was not performing to its satisfaction, including Braxton's poor sales performance in 2010 and the first two quarters of 2011 and Braxton's allowing an expired endovascular device to be implanted into a patient.

Braxton's only response to Cook's evidence of unsatisfactory job performance is his own testimony, which cannot establish a genuine issue as to whether he was meeting Cook's expectations. See King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003) ("It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.") (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 960-61 (4th Cir. 1996)).

Braxton does not dispute the low sales numbers and the expired graft incident. Instead, he simply tries to show that these failures did not justify either being placed on the PIP or ultimately being fired. For example, as to his low sales figures, he relies heavily on a November 2009 performance review that reports a decline in sales over the previous year and

states that "[t]he numbers reflect the territory, but not [Braxton's] efforts." Dkt. No. 48 at 4, Ex. 32. Braxton argues that "[i]t's reasonable to infer that a period of 'growing pains' and 'breaking in' are usual and normal when anyone begins a new position" and that "[e]vidence from Cook will show that sales growth in any given territory may be cyclical and there are many factors that govern sales growth that vary from one territory to another."[4] Dkt. No. 48 at 4.

The "growing pains" argument may be fairly used to explain the lower sales figures for 2009; however, it does not adequately explain the poor sales numbers for 2010 and the first two quarters of 2011 – the time period Cook focused on when making its decisions to place Braxton on the PIP and to eventually terminate him. Braxton's assertion that his "performance in the first quarter of 2011 was a marked improvement" [Dkt. No. 48 at 4] is self-serving and does not defeat Cook's argument that the first quarter 2011 sales were not a "marked improvement" from Cook's perspective. See Smith

---

[4] Braxton also states that "Cook records should indicate the number of sales representatives in the territory within a 5 to 10 year span prior to my hiring in March 2009." Dkt. No. 48 at 4. Without speculating as to what Cook's records would or should show in this respect, it is clear that certain sales records were produced to Braxton during discovery, as they are attached as Exhibit 43 to his opposition; however, there is no indication in the record that Braxton requested sales records to substantiate this argument.

v. Flax, 618 F.2d 1062, 1067 (4th Cir. 1980) (stating that "[i]t is the perception of the decision maker which is relevant" in determining whether a plaintiff alleging discrimination has satisfied the third element of the McDonnell Douglas test).

As to Cook's concerns about Braxton maintaining an expired graft in his Zak kit and allowing the graft to be implanted into a patient, Braxton does not dispute the underlying event; rather, he argues that he did not, in fact, "allow the physician to implant an expired device in a patient because the Plaintiff did not know that the device was expired at the time of implantation and nor did the physician or the staff present in the operating room have knowledge of an expired device." Dkt. No. 48 at 5-6 (emphasis in original). Braxton admitted during his deposition, however, that he was responsible for checking the expiration dates on Cook products and failed to do so. Dkt. No. 36, Ex. 1 at 193.[5] That admission, made under oath, establishes that from Cook's point of view, Braxton should have known the device was expired.

---

[5] Braxton's disagreement with Cook's "assessment" of his failure to take responsibility for the risk associated with the incident not only fails to consider the relevant perception - Cook's - but also relies on plaintiff's own statements. See Dkt. No. 48 at 6, Ex. 39. The other evidence Braxton relies on, a letter from Cook, merely "comments on the potential concerns of this situation, as it relates to patient safety." Dkt. No. 48, Ex. 35.

14

Braxton does not dispute that he failed to meet the goals set in the PIP. Instead, he attacks the PIP as unrealistic and merely an excuse to fire him. See Dkt. No. 48 at 2 (arguing that "the PIP had certain unachievable goals that were designed for the Plaintiff to fail," including allowing him only nine business days to achieve his April sales goal). Similarly, Braxton asserts that "[c]ustomer complaints about Plaintiff's clinical competency and work performance[] are facilitated by Cook management and are unwarranted,"[6] and that contrary to Cook's representation, he "had already put into action the necessary steps to ensure patient safety and physician confidence" after the March 2011 incident involving the expired graft and before Cook knew of the incident. Id. None of these assertions is supported by evidence demonstrating that Cook's business expectations were unfair, that the goals set out in the PIP were unreasonable, or that customer complaints (whether

---

[6] Braxton's only attempt to create a genuine issue as to the customer complaints Cook received regarding his work is to repeatedly state that "[t]he Plaintiff disagrees with the allegations from Cook and objects due to hearsay and a lack of substantiated evidence or affidavits." Dkt. No. 48 at 5. Burger and Shurig's declarations about these complaints are not hearsay because they are not offered for the truth of any customer complaints but for their effect on Burger and Shurig, who made the decision to place Braxton on the PIP and, ultimately, terminated his employment. See Shurig Decl. ¶ 26 ("As a result of . . . complaints received from physicians, operating room staff, purchasing staff and co-workers . . . Cook placed Braxton on a Performance Improvement Plan ('PIP').").

warranted or unwarranted) were insignificant to Cook as they related to Braxton's performance. In sum, Braxton proffers no evidence to demonstrate that his performance was, in fact, satisfactory. See King, 328 F.3d at 149-50.

Braxton also fails to satisfy the fourth requirement for establishing a prima facie case of discrimination by failing to provide any evidence, other than his opinions, that other, similarly situated individuals who were not members of his protected class were treated more favorably than he was. As a matter of law, that opinion is insufficient. See Dkt. No. 36 at 21-22, Ex. 1 at 242-44, 246-47, 249, 251.

Even assuming that Braxton had established a prima facie case of unlawful discrimination, Cook has articulated several, legitimate, non-discriminatory reasons for placing him on the PIP and firing him, including Braxton's poor sales performance, the customer complaints received regarding his work, and the incident involving the expired graft. Braxton makes no argument and provides no evidence that Cook's articulated reasons are false and that discrimination was in fact the reason for the adverse employment action. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993) ("[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason.")

16

(quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)) (emphasis in original).

As Braxton has offered no direct evidence of unlawful race discrimination and failed both to establish a prima facie case of discrimination and to prove by the preponderance of the evidence that Cook's articulated reasons for its adverse employment actions were pretextual, his race discrimination claim fails as a matter of law and summary judgment in Cook's favor is appropriate.

### C. Braxton's Retaliation Claim

Like race discrimination claims, unless there is direct evidence of retaliation, claims of unlawful retaliation under Title VII are analyzed under the burden-shifting framework set out above. Accordingly, Braxton must establish that (1) he engaged in protected activity, such as filing an EEOC complaint; (2) Cook took an adverse employment action, such as termination; and (3) a causal connection exists between the protected activity and the adverse employment action. Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994). If Braxton can make this showing, the burden shifts to Cook to articulate a non-retaliatory reason for its action, and if Cook can articulate such a reason, the burden shifts back to Braxton to prove by a

preponderance of the evidence that Cook's reason is merely a pretext for retaliation. Id.

Braxton relies solely on the time between the filing of his EEOC complaint in late April 2012 and Cook's decision to terminate him in early July 2012 as establishing a causal nexus and establishing a prima facie case of retaliation. Dkt. No. 48 at 10-11. Although temporal proximity might be sufficient in some instances, in Braxton's case it is undisputed that Cook was considering terminating Braxton's employment as early as mid-April 2011 when it placed him on the PIP, which explicitly warned that failure to achieve the minimum sales goals could result in termination. See Shurig Decl. Attachs. 10, 11. That evidence undercuts any inference that might be drawn in Braxton's favor from the temporal proximity of his termination to the time when he filed his EEOC complaint. See Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001) (per curiam) (stating that temporal proximity between employment action and protected activity is "immaterial" when an employer contemplates the action before learning of the protected activity).

Even if he had established a prima facie case of retaliation, Braxton fails to prove that Cook's legitimate, non-retaliatory reasons for firing him were pretextual because he clearly failed to satisfy the PIP. For these reasons, Braxton's

18

unlawful retaliation claim fails as a matter of law and summary judgment in favor of Cook is appropriate.

### C. Braxton's Age Discrimination Claim

Under the ADEA, a complaint of age discrimination must be filed with the EEOC "within 180 days after the alleged unlawful practice occurred," and "[n]o civil action may be commenced by an individual . . . until 60 days after a charge alleging unlawful discrimination has been filed." 29 U.S.C. § 626(d)(1). Failure to exhaust the administrative remedies provided under the ADEA deprives a federal court of subject matter jurisdiction over an age discrimination claim. Jones v. Calvert Grp., Ltd., 551 F.3d 297, 300-01 (4th Cir. 2009) (citing Vance v. Whirlpool Corp., 707 F.2d 483, 486-89 (4th Cir. 1983)).

Neither of Braxton's two EEOC complaint forms alleged age discrimination. His first complaint specifically alleged that Cook's "Black employees are treated differently than the White employees," and his second complaint alleged that he had been "discriminated against on the basis of my race (Black), and retaliated against for engaging in protected activity." Shurig Decl. Attachs. 12, 13.[7]  Because Braxton has failed to exhaust

---

[7] Both of the EEOC complaint forms signed by Braxton included check boxes for ten bases of discrimination: "race," "color," "sex," "religion," "national origin," "retaliation," "age," "disability," "genetic information," and "other (specify)." Shurig Decl. Attachs. 12, 13. On the first form, Braxton

19

the administrative remedies provided under the ADEA, this court lacks subject matter jurisdiction over this claim, which fails as a matter of law. Summary judgment in favor of Cook is therefore appropriate.

## IV.   CONCLUSION

For the reasons stated above, Cook's Motion for Summary Judgment will be GRANTED by an appropriate Order to be issued with this Memorandum Opinion.

Entered this 31st day of July, 2013.

Alexandria, Virginia

/s/ _____
Leonie M. Brinkema
United States District Judge

---

checked only "race"; on the second, only "race" and "retaliation" are checked. Id.